## No. 15,106.

### North American Life Insurance Company of Chicago v. Korrey.

(157 P. [2d] 149)

Decided March 19, 1945.

Mr. George E. McConley, Jr., Mr. Arthur C. Rooney, for plaintiff in error.

Mr. Raymond M. Sandhouse, for defendant in error.

*En Banc.*

Mr. Justice Knous delivered the opinion of the court.

Plaintiff in error, hereinafter to be denominated the company, seeks reversal of a judgment obtained against

it upon a policy insuring the life of John Korrey, at the suit of defendant in error beneficiary, the widow of the insured, to whom we shall refer as plaintiff.

The policy in question was dated November 1, 1938, but under a "short term" arrangement had been in effect a few months previously. The insured died April 28, 1940 of periduodenitis. In the record it is undisputed that periduodenitis is one of the end results of stomach ulcer.

In the application for insurance, which was attached to and expressly made a part of the consideration for the contract, the following questions and answers appear:

"19d. Have you ever had any of the following: Disorder of digestive or abdominal organs: (Such as appendicitis, gall stones, jaundice, colic, diseases of the stomach or liver, etc.) A. No.

"20. Have you within the last seven years consulted any physician not previously mentioned? A. No."

Pursuant to the company's procedure, the foregoing answers were recorded in the handwriting of the medical examiner. Upon the application, over the signature by mark of the insured, appears the declaration that each of the above answers are "full, complete and true, and that to the best of my knowledge and belief I am in good health and a proper subject for life insurance." The application was dated August 15, 1938.

As its defense to the payment of the policy the company claimed that insured was guilty of misrepresentations in the application, particularly in making the answers quoted above, and averred that, in truth and fact, within seven years prior to his application, to wit: from September 4, to September 27, 1937, he had been treated by a physician for an ulcer of the stomach and that at said time the insured, who allegedly was then "gravely ill, confined to his bed, vomiting blood and hemorrhaging" was informed of such condition and ailment by the physician in attendance.

At the conclusion of all the evidence the company moved for a directed verdict upon the contention that the questioned representations of the insured were shown by the uncontradicted evidence to have been both material and false and so sufficient in law to avoid the policy. The motion was overruled and the issues given to a jury, which returned a verdict for plaintiff. In this review the company primarily claims the court transgressed in failing to direct a verdict in its favor and, secondarily, if a jury question inhered, that the court erred in refusing certain instructions tendered by it.

The policy provides that: "All statements made by the insured shall, in the absence of fraud, be deemed representations and not warranties * * *." Although, to avail itself of the exception, the company pleaded as its second defense that the alleged misrepresentations constituted a fraud upon it, the cause was tried below, and is presented here, upon the theory that the declarations in question were representations and not express warranties and we shall consider the review on that basis.

The insured, a farmer, fifty-three years of age at the time of the application, had lived near Iliff in Logan county for many years. He was born in Syria and emigrated to the United States shortly after the turn of the century. He was admitted to citizenship in this country in 1909. He never learned to read or write English, but could converse in that language. The insurance was solicited by a Mr. Sanders, an agent of the company. On the agent's first call he talked to the insured and plaintiff and was informed by the latter that her husband could not afford the policy, but subsequently, on August 15, 1938, the insured, unaccompanied by any member of his family, went with the agent to Dr. J. H. Daniel, the company physician, for a medical examination in the course of which the portion of the application herein involved was completed. No oral evidence

as to what transpired at the medical examination was given at the trial.

For the company, Dr. J. E. Naugle, for twenty-five years a practicing physician and surgeon in Sterling, testified that he had known insured from ten to twelve years and had been called to treat him professionally, the first occasion being in 1929 at his home; that at such time insured was confined to his bed, had pain in his abdomen and had vomited and passed blood by bowel; that from the case history and examination he concluded that the insured had an ulcer of the upper intestinal tract, either in the stomach or duodenum; that he then so informed insured and prescribed a milk and cream diet, which later on was increased to soft foods. That he later determined this diagnosis was correct and advised the insured he had ulcers of the stomach and suggested an operation therefor, to which the insured refused to accede. That he attended the insured in 1937 and in September of that year treated him upon a number of occasions for ulcers of the stomach by injecting Larostidin. That the history of the ulcer from the time he treated insured in 1929 to the time of his death, when witness was still the attending physician, was one of recurrent hemorrhages and attacks of pain. That in July, 1938, insured suffered a relapse, at which time witness was called to insured's home and treated him. That following the death of insured, witness performed an autopsy which, while not revealing an ulcer, disclosed a large amount of scar tissue about the duodenum which had resulted from an ulcer. That he had never treated the insured for any ailment except ulcers. ·

By deposition, Dr. Charles B. Irwin, the medical director of the company, testified that in evaluating the risk he had relied absolutely on the truthfulness of the negative answer to the interrogatories in examination and that had the responses to either of those questions been otherwise, an investigation would have been

made and, if such showed insured was afflicted with a stomach ulcer, the policy would not have been issued.

Concerning the condition of the health of insured, plaintiff testified on direct examination that, except for a "little trouble" in 1937, her husband had enjoyed good health until the March preceding his death in April, 1940. She stated that, in the latter part of March, insured, in acute pain, had come into their house with his hands over his abdominal area. Ronald Korrey, a young son of the couple, testified that immediately preceding such entry, while carrying a partially filled feed barrel, insured had stumbled, then "set the barrel down and held on to his stomach and told me to help him to the house." Almost continuously from that day until his demise, the insured was confined to the hospital. Apparently with this incident in mind, plaintiff, by amendment to her complaint, which originally asked for recovery of $2,000, the face of the policy, alleged that the death of the insured was effected by "external, violent and accidental means" and sought judgment for $4,000 under the "double indemnity clause" of the policy. At the close of plaintiff's case the court sustained the company's motion to dismiss the double indemnity claim on the ground of deficiencies in the proofs of death, the pleadings and the proof. No cross error to this ruling is assigned.

On cross-examination plaintiff admitted that, in addition to the "little trouble" of 1937, insured was sick in 1929. "He hurt himself one day * * * with a hog shoat or something. He hurt himself inside his stomach. * * * "Q. (f. 151) As a result of that was Mr. Korrey in bed? A. He was in bed for a few days, yes. Q. Did you have a doctor? A. Dr. Naugle. Q. Did he go to your home in 1929? A. Yes, sir. Q. Was your husband sick and vomiting? A. He didn't vomit. Q. Did he bleed. Did he hemorrhage? A. On the side a little. He did, yes. Q. On the side? A. Inside, he did. Q. Didn't Dr. Naugle tell you what was wrong? A. Mr. Dr.

Naugle said, 'What is the matter, you been lifting something?' Mr. Korrey said he don't know. He said maybe he hurt himself. Q. Didn't Dr. Naugle tell him what the trouble was? A. No. Q. Didn't he tell him he had an ulcer of the stomach? A. Not then. Q. Not at that time. When was it that he told him that? A. Just one time in 1937, Mr. Korrey was sick; don't feel good, and Dr. Naugle come to the house once and told him 'Be careful what you eat for a few days.' Then at the time Dr. Naugle treated him in 1929 he told Mr. Korrey to drink only milk and cream. Q. He told him in 1929 to drink only milk and cream? A. For a few days, yes."

The witness then stated that Dr. Naugle never attended her husband again until 1937; that insured was fat and healthy, did his own work on a big farm, and was never sick in bed or vomited blood until "just when he died." Q. (f. 156) Isn't it a fact also that Dr. Naugle told Mr. Korrey in your presence that he should have an operation, and if he didn't one of these times he would die in one of these bleeding spells? A. No, I didn't hear him. Q. Didn't Mr. Korrey object to having an operation? A. He didn't want none. Q. He told Dr. Naugle that he didn't want any? A. I didn't hear nothing. What he want an operation for? He didn't need one." * * * Q. (f. 157) Do you know why Dr. Naugle treated Mr. Korrey in 1937? A. He come to the house. Q. What for? A. He is sick a little. Everybody get sick sometime. Q. What was the matter with him; how did he act? A. He had a bad cold or something, I forget. * * * Q. Mr. Korrey also went to Dr. Naugle's office for treatments after he was up and able to be out of bed? A. I don't think so. I don't know." She said the insured could not drive a car and that she had accompanied him on but one visit to Dr. Naugle's office, which was in 1940; that prior to March, 1940, insured had not complained of pains in his stomach, but that: "Sometimes he ate something that didn't agree with him and he had a stomach-ache * * * "; that in

1929, but not thereafter, insured went on a diet of milk and cream and that the insured never consulted Dr. Naugle, at any time, from 1929 to 1937. "Q. (f. 161) But he did consult Dr. Naugle several times in 1937, didn't he? A. I know once he came to the house, that is all I know. Q. Wasn't that in July, 1938, when he came to the house? A. No. Q. Wasn't that just a short time before he made this application for insurance? A. In 1938 Dr. Naugle never come to the house. He come to the house in 1937. 1938 we never had a doctor. Q. In 1938? A. No, sir. Dr. Naugle never put a foot in our house in 1938. Q. What did he go to the house for in 1937? A. For Mr. Korrey and the children. Q. What did he do for Mr. Korrey? A. I don't know what he done. Q. Was he sick in bed? A. He was sick in bed for two days. Q. Four days? A. Two days, and the doctor come once. Q. Did Mr. Korrey vomit any blood at that time? A. No." The witness then denied categorically that insured had ever vomited blood until just before he died; that Dr. Naugle had ever advised insured to have an operation or had told him at any time that he had stomach ulcers.

On rebuttal (direct examination), after hearing the testimony of Dr. Naugle, plaintiff stated that Dr. Naugle never had told her that insured had ulcers of the stomach and that she was present in the room at the times Dr. Naugle came out to examine Mr. Korrey. "Q. (f. 243) Did he, on any of those occasions, tell Mr. Korrey that Mr. Korrey had ulcers of the stomach? A. I don't know. I didn't know what ulcer mean until now. Q. Did he ever tell him that he had ulcers? A. I don't know——"

"By Mr. McConley. That is objected to as asking him whether he ever had ulcers.

"By Mr. Sandhouse. I am not asking that. I am asking whether Dr. Naugle made a statement in her presence to that effect. (No ruling).

"A. No, he didn't. He just say cream and milk for a

few days. If he did tell me I don't know. He was ready to go home and he say you have got a little fever—— Q. What was that? A. He said you have a little fever. He said he had a hemorrhage, and that is all and he left and we didn't call him until 1937 when he got sick with upset stomach, and he come the 25th of July, 1937, and he saw Mr. Korrey and said he have upset stomach and give him cream and milk for a few days and that is all he said. And he never came back in 1938. Mr. Korrey never—— Q. Just a minute—— A. Mr. Korrey never throw up blood excepting when he die——

"By Mr. McConley. We will object to this——

"A. In 1938 he never was in the house, Dr. Naugle."

On recross-examination the witness said the insured had hemorrhages in 1929, and: "Q. (f. 246) You say that Dr. Naugle didn't tell you or Mr. Korrey that he had ulcers of the stomach? A. Maybe he did tell Mr. Korrey, but we don't know what ulcer mean. Q. You say he didn't tell you? A. No. Q. He could have told Mr. Korrey he had an ulcer of the stomach and you not know a thing about it? A. I don't know. Maybe."

No witnesses other than those above named took the stand at the trial. Under their testimony, which, because of its controlling effect on the question raised in this review we have recited in greater detail than ordinarily is required, it is certain, as a matter of fact, that in 1937, about one year before the application for insurance was made, the insured had consulted and been treated by Dr. Naugle. Thus, if interrogatory 20, supra, of the application is considered as calling for an honest disclosure from the insured as to whether within the seven years preceding he had consulted a physician, the negative answer herein given surely was untrue.

Counsel for plaintiff, inferentially conceding the fact, nevertheless argues that, under the form of the question: "Have you within the last seven years consulted any physician *not previously mentioned?*," the insured's

answer literally was correct, since it does not appear that any physician at all had been referred to in the preceding portion of the application, and he cites *Van Wormer v. Metropolitan Life Ins. Co.,* 188 Ill. App. 166, as so holding. The opinion in that case as cited is not reported in full, but appears in the form of an "Abstract of the Decision," wherein there is language which impliedly supports plaintiff's position. However, it also appears therefrom, differently from the suitation here, that the questions and answers in the application were stricken out by a long cross mark drawn through them and there was a conflict in the evidence whether the questions were in fact asked and the answers given. It also appears in the abstract that the striking out of the questions, was held sufficient to put the company on notice, and that by accepting the application in such condition and issuing a policy, it was thereafter estopped to question the integrity of the answers. The form of the application therein is not disclosed by the reported abstract, nor from quotations in plaintiff's briefs, apparently taken from the unpublished opinion. In the application herein involved, opposite questions 19A to I inclusive, containing inquiries as to whether insured had had the specific ailments therein mentioned, a column is reserved for recording the "Name and address of Physician consulted, if any." Thus, it seems to us the clause "any physician not previously mentioned," in questioned Interrogatory 20, was merely intended to avoid the repetition of disclosures previously made in question 19, but where, as here no physician at all had been named in the latter series, the qualification of 20 would not relieve an applicant from making a truthful disclosure as to whether he had consulted *any* physician within the last seven years. In other words, the question simply meant: Give the name of any physician, not previously mentioned, whom you have consulted within the last seven years. Considered in this obvious sense, it is uncontradicted in the evi-

dence that insured answered question 20 falsely.

In the opinion in *Germania Life Ins. Co. v. Klein*, 25 Colo. App. 326, 137 Pac. 73, Judge King, speaking for our Court of Appeals stated: "In our opinion, no inquiry was made in the instant case, or can be made, more material to the risk and more essential to properly advise the company contemplating or considering the issuance of a policy, and which would more probably influence it in determining whether it would enter into the contract, than the question as to whether the applicant had consulted a physician, or what physician she had consulted. It is in evidence that this answer was relied on by the company in approving the application. If the applicant had truthfully answered that she had consulted and been treated by Dr. Lefcowitch, inquiry could have been made of him, and it will be presumed that the company would have been informed that he diagnosed her case as carcinoma of the liver and had so treated it, and there is little reason to doubt that such information would have so influenced the defendant in this case that it would have declined the application. It appears that the applicant had not been advised, by the doctor she consulted, of the gravity of her ailment or disease as diagnosed by him; but the fact of the consultation of a physician or its materiality does not depend upon the gravity of the subject of the interview as regarded by the patient; and while such a representation may at times be found and held to have been immaterial to the risk, and if false not prejudicial because the consultation was in fact, both from the viewpoint of the patient and of the physician consulted, for a merely temporary ailment, that fact cannot avail plaintiff in this case, where the materiality of the representation has been so fully and conclusively shown by the evidence. That statements to consultations of or attendance by physicians under such circumstances are material to the risk, and if false avoid the policy to the same extent as if they had been express war-

ranties, is supported by both reason and authority * * * [Citing numerous authorities and texts]. There should be no deviation from this rule as to untrue answers in an application in regard to matters material to the risk and which are within the knowledge of the applicant."

The foregoing decision has been accepted generally as stating the law on this subject in Colorado. See, Cooley's Briefs on Insurance, vol. 4 (2d ed.), p. 3375, and annotation 131 A.L.R. 617, at 618, 621 and 627. Thereunder, it is to be observed that the circumstance that an applicant for a policy of insurance may have been ignorant or unappreciative of the nature of the disease from which he was suffering when he consulted a physician, and may have assumed that the same was not material to the risk or of no consequence, does not protect him or render the representation that he did not consult a physician immaterial, when there was in fact a consultation, the disclosure of which was material to the risk. See, 131 A.L.R. 621, citing *Germania Life Ins. Co. v. Klein, supra,* and authorities from other jurisdictions.

Thus, since in the case at bar the fact of the consultation of the insured with Dr. Naugle within thirteen months at the most from the date of the application, presumably a matter within the personal knowledge of the deceased, stands admitted, the holding in *Germania v. Klein, supra,* as a matter of law, is decisive in favor of the contention of the company on this point, unless it can be said there was evidence from which it might be found that the admitted consultation "both from the viewpoint of the patient and the physician" was "for a temporary ailment."

The bare statement of plaintiff, hereinabove set out, that on the occasion of the 1937 consultation the insured "had a bad cold or something, I forget" (f. 157), considered with her subsequent admission that at such time her husband was "sick with upset stomach," cannot be accorded the effect of contradicting the positive

testimony of Dr. Naugle that the consultation in question had to do with stomach ulcers, especially where it is undisputed that the cause of insured's death in 1940 was periduodenitis, "one of the final results" of stomach ulcer. Nor do we believe, considering the admissions of plaintiff, that alleged variance between certain dates mentioned in the testimony of Dr. Naugle and others, contained in the certificate and proofs of death signed by him, seriously impinged his veracity and certainly could not have the effect of creating a conflict in the evidence in the case per se. See, *Thuringer v. Trafton*, 58 Colo. ·250, 255, 144 Pac. 866.

█ In *Germania Co. v. Klein, supra,* it was held that where a material false representation made by the insured was shown by uncontradicted evidence, it was error to submit that question to the jury as one in dispute. We are satisfied that this contingency attains here, and that the court erred in not directing a verdict for the company because of the falsity of the answer of insured to question 20, supra.

The same conclusion, we are convinced, must be reached with respect to the issues on question 19d.

It was pronounced additionally in *Germania Co. v. Klein, supra,* p. 331, that "A false statement or declaration of a fact material to the risk, and upon which the policy is based, will avoid the policy, whether that misrepresentation be the result of intention or of mistake, and whether made in good faith or not so made. Such misrepresentation is as fatal to the policy as a breach of warranty." *American Bond & Trust Co. v. Burke,* 36 Colo. 49, 58, 85 Pac. 692, and *Security Benefit Ass'n v. Talley,* 78 Colo. 358, 241 Pac. 721, are in harmony. See, also, *Zolintakis v. Equitable Life Co.,* 108 F. (2d) 902, which distinguishes the rule in *Germania Co. v. Klein, supra,* from that followed in *Moulor v. American Life Ins. Co.,* 111 U. S. 335, 4 Sup. Ct. 466, 28 L. Ed. 447, a case relied upon by plaintiff.

From the foregoing recital of the evidence it would

seem certain that question 19d, inquiring as it did with respect to "diseases of the stomach," as a matter of law was material to the risk. See, *Lyttle v. Pacific Mutual Co.*, 72 F. (2d) 140; *Demirjian v. New York Life Ins. Co.*, 205 Wis. 71, 236 N.W. 566, and *New York Life Ins. Co. v. Levin*, 102 F. (2d) 403. Neither can we find in the record where the falsity of the answer is challenged by substantial evidence; nor, as we view, can it be said therefrom that when the application was made insured was without knowledge of his physical condition in the sense contemplated by *Southern Security Co. v. Farrell*, 79 Colo. 53, 244 Pac. 475. Recalling the testimony of Dr. Naugle and noticing the implied admission of plaintiff appearing at folio 152, supra, that in 1937 Dr. Naugle had informed insured that he had an ulcer of the stomach, as well as her repeated assertions that she did not know what Dr. Naugle had told Mr. Korrey about his ailment, it cannot be maintained soundly, that her single categorical denial that insured had not been apprised of his condition by his physician, was sufficient to raise an issue of fact on this phase of the case.

Plaintiff further seeks to avoid the effect of the questioned answers upon the basis of the alleged illiteracy of the insured and cites *New York Life Ins. Co. v. Fukushima*, 74 Colo. 236, 220 Pac. 994, as supporting this contention. An examination of that opinion discloses that the decision did not hinge upon the illiteracy of the insured, but rather turned upon the principle, foreign to the instant controversy, that the company was estopped from relying upon the falsity of answers in the application as a defense to an action on the policy where such false statements were known by the solicitor and medical examiner of the company who had acted to keep the true facts, as disclosed by the insured, from appearing in the application. The remarks in the opinion concerning the insured's lack of acquaintance with the English language largely were directed to discounting the company's claim that after receipt of the

policy it was obligatory upon him to examine it and within a reasonable time repudiate the false answers or suffer the result. The case of *Federal Life Ins. Co. v. Kras*, 96 Colo. 589, 45 P. (2d) 636, also cited, is of the same general character. No such contentions are made by the company in the case at bar. Additionally, in this connection, we think it proper to mention that factually the insured had been a resident of the United States for over thirty-five years and in 1909 successfully passed his examination for citizenship. The plaintiff, his companion of many years, testifed that insured understood the English language as well as she. An examination of her verbatim testimony herein shows that she expressed no inability to understand counsel's questions and experienced no great difficulty in answering pertinently.

The judgment is reversed.

MR. CHIEF JUSTICE BAKKE dissents.

MR. JUSTICE STONE did not participate.